IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA
MONROE DIVISION

| | | |
|---|---|---|
| **MARVIN EDWARD WARE** | * | **CIVIL ACTION NO. 06-2189**<br>Section P |
| **VERSUS** | | |
| | * | **JUDGE JAMES** |
| **MOREHOUSE PARISH DETENTION CENTER, ET AL.** | * | **MAGISTRATE JUDGE HAYES** |

## REPORT AND RECOMMENDATION

Before the undersigned Magistrate Judge, on reference from the District Court, is a Motion for Summary Judgment filed by Sheriff Danny McGrew, Warden Robert Tappin, Sr., Assistant Warden I. Brown, Sergeant Jackie Robinson, Sergeant Klax, Deputy John Harris, Sergeant Smith, and Correctional Officer Morrison ("Defendants") (Doc. #105). For reasons stated below, it is recommended that the motion be **GRANTED in part and DENIED in part.**

## BACKGROUND

On November 14, 2006, Plaintiff Marvin Edward Ware filed a civil rights complaint *in forma pauperis* pursuant to 42 U.S.C. § 1983. He claims that his constitutional rights were violated by the above-named prison officials while he was incarcerated at the Morehouse Parish Detention Center ("MPDC"). [Complaint, Doc #1; Amended Complaint, Doc. #18]. Ware's original complaint states that from November 4, 2005, to October 1, 2006, he was forced to inhale second-hand tobacco smoke while incarcerated. He states that he was forced to live in a dorm with 52 or more inmates, of whom 30 or more smoked seven days a week. He further states that as a result of being exposed to second hand smoke, he developed a cough. Ware also alleges that it looks "like a fog" in the prison and the ventilation is inadequate. Ware states that the day after he filed his grievance, Warden Brown told him that inmates who had a problem

1

with second-hand smoke could be transferred to a lock-down cell, but he told Warden Brown that he did not want to be "punished" by being put in lock-down. Therefore, he asked to be transferred to another facility, but Warden Brown refused. In his amended complaint, Ware alleges that Defendants were aware that inmates were smoking in the dormitories and in the lock-down cells and that this "put them in deliberate indifference" to his serious medical needs. He further alleges that on the day he was transferred from MPDC, Defendants Sergeant Klax and Deputy John Harris placed him a lock-down cell and took every Administrative Remedy Procedure ("A.R.P.") he had written on them and all of the copies of paperwork he had against them.

In his deposition testimony, Ware stated that he first arrived at MPDC on approximately June 21, 2005, and was transferred from the facility on November 14, 2006. *Id.* at 15-16. According to Ware, he was moved around from dormitory to dormitory, but he started having problems with second-hand smoke immediately due to the level of smoke; he stated that the level was about the same in each dormitory in which he lived. *Id.* at 16. With regard to the layout of the dormitories, Ware testified that there was a bed area, next to which there were some tables for dining; next to the tables, approximately four or five feet away, there was a wall, beyond which there were toilets, showers, and sinks. *Id.* at 17. Ware stated that there were approximately 52 people in the dormitories. *Id.* at 18. He stated that there was no designated smoking area, but there was a rule that the inmates could not smoke in the bed area; however, according to Ware, some inmates smoke in their beds, especially at night. *Id.* Ware testified that whether a guard would stop an inmate who was smoking in the bed area from doing so "depend[ed] on who they was." *Id.* When asked whether there were any other areas in the dormitory where inmates were not supposed to smoke, Ware stated, "They smoked everywhere." *Id.* He then stated that

smoking was also prohibited in the television area. *Id.* at 19. According to Ware, air conditioning came in to the dormitory from a vent located directly above the shower area; however, he stated that it did not have "proper circulation of air going out." *Id.* at 11;19. When asked whether there were any other vents in the dormitory, Ware stated that "[t]hey had one ugly-looking vent but it stayed still." *Id.*

Ware stated that he grew up with asthma, but that his system grew stronger as he got older and he does not have a history of treatment for asthma as a adult. *Id.* at 12. He testified that he smoked cigarettes in the past, but that he quit for good in 2004. *Id.* at 12-13. When asked if he has ever been sent to the hospital for a condition resulting from exposure to second-hand smoke, Ware responded that he made a sick call at the prison where he is currently incarcerated, Forcht Wade Correctional Institute in Rayville, Louisiana, but nothing was done. *Id.* at 14. Ware testified that being exposed to second-hand smoke has resulted in his eyes being red, which he stated normally indicates kidney or liver failure or something to that effect; in addition, he has headaches. *Id.* However, he stated that a physician has not told him that his red eyes or headaches are the result of second-hand smoke. *Id.* at 15. According to Ware, the reason he has not seen a physician is that he has not been given a chance to do so. *Id.*

Ware testified that he filed a grievance regarding his exposure to second-hand smoke, but he did not remember the date. *Id.* at 20. When asked if the grievance was filed on October 1, 2006, which is the date reflected on the grievance attached to his complaint, Ware stated that he filed a couple of grievances, but some of them were thrown away. *Id.* When asked if he thought he might have filed another grievance, he stated that he filed a couple grievances with Warden Brown. *Id.* at 21. He then stated that a lot of his paperwork was thrown away when he was transferred out of MPDC; he stated that two guards locked him in one of the lock-down cells,

took his legal work, and "took everything [he] had out of there on them."[1]  *Id.* at 21-22.  Ware then stated, however, that he could not remember if he "filled out a grievance" before October 1, 2006.  *Id.* at 22.

When asked about the records from the MPDC commissary showing that he bought cigars on several occasions, Ware stated that he did not remember doing so but, if he did, they were bought for dealings with other inmates, not himself.[2]  *Id.* at 23-26.  He admitted buying tobacco that could be used to roll cigarettes on numerous occasions, but again stated that he bought it to make money from other inmates and did not smoke it.[3]  *Id.* at 26-27.  Ware also admitted that the inmates to which he was giving the tobacco were smoking it in the dormitory, thereby creating the second-hand smoke problem.  *Id.* at 27.

When asked how long it was between the time he complained about the second-hand smoke and the time he was transferred from MPDC, Ware stated that he did not know, but that Warden Brown basically told him that he was never going to transfer him.  *Id.* at 28.  However, the record shows that Ware was transferred six weeks after he filed his October 1, 2006, grievance regarding the second-hand smoke.  When asked whether anyone had determined the levels of environmental tobacco smoke present in his dormitory at MPDC, Ware stated that no one was allowed to do so, but that the level of second-hand smoke was so high that the white

---

[1] He stated that one of the guards was a sergeant whose name he could not remember, but he "was a preacher there."  *Id.* at 21.

[2] The records submitted by Defendants indicate that Ware purchased cigars from the commissary on June 22, 2005, December 20, 2005, December 28, 2005, February 15, 2006, May 31, 2006, and June 14, 2006. [Def. Ex. C].

[3] The records submitted by Defendants show that Ware bought tobacco from the commissary on July 6, 2005, December 28, 2005, February 15, 2006, August 9, 2006, and October 18, 2006. [Def. Ex. C].

4

laundry baskets and the ceiling were dingy yellow. *Id.* at 29. He then stated that there is no safe level of environmental tobacco smoke. *Id.* However, he admitted that no one ever told him that the level of discoloration on the laundry baskets and ceiling was caused by tobacco smoke because no one was allowed to do such a thing. *Id.* at 29-30. Ware stated that the level of environmental tobacco smoke would "knock them down." *Id.* at 30. He further stated that he has not seen a physician regarding his exposure to second-hand smoke so he could not provide an answer regarding whether he had any documentation showing that he suffered any injury as a result of being exposed to tobacco smoke. *Id.* at 31.

Ware testified that smoking was not allowed in the lock-down cells, which were two-man cells, but that there was a one-inch gap between the door and the floor through which the inmates would slide lighters and tobacco products. *Id.* at 31-32. When asked whether he thought that the officers knew inmates were smoking in lock-down, Ware stated that the officers would come and search the lock-down cells for contraband "every so often." *Id.* at 32. He stated that he "guessed" the officers would confiscate any tobacco products that were found. *Id.* at 33.

**LAW AND ANALYSIS**

<u>Summary Judgment Standard</u>

Summary judgment is appropriate when the evidence before the Court shows that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. F.R.C.P. Rule 56(b). While the facts are to be reviewed with all inferences drawn in favor of the non-moving party, factual controversies are resolved in favor of the non-movant only when there is an actual controversy. That is, when both parties have submitted evidence of contradictory facts. *McCallum Highlands, Limited v. Washington Capital DUS, Inc.*, 66 F.3d 89,

92 (5th Cir. 1995). There can be no genuine issue as to a material fact when a party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). This is true "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323.

The moving party bears the initial burden in summary judgment and must demonstrate through portions of the pleadings, depositions, answers to interrogatories, admissions and/or affidavits that no genuine issue of material fact exists. *Celotex Corp.*, 477 U.S. at 323. Once the moving party has successfully demonstrated the absence of a genuine issue of material fact, the burden shifts to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The non-moving party may not merely rely on the allegations and conclusions contained within the pleadings; rather, he "must go beyond the pleadings and designate specific facts in the record showing that there is a genuine issue for trial." *Wallace v. Texas Tech Univ.*, 80 F.3d 1042, 1047 (5th Cir. 1996). Furthermore, these specific facts must be shown through something more than "some metaphysical doubt as to the material facts, by conclusory unsubstantiated allegations, or by a mere scintilla of evidence." *Little v. Liquid Air. Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

Environmental Tobacco Smoke Exposure

In *Helling v. McKinney*, 509 U.S. 25, 33-35 (1993), the United States Supreme Court held that "prison officials may violate the Eighth Amendment's prohibition against cruel and unusual punishment by exposing inmates to an excessive level of ETS [environmental tobacco smoke]." *In re Omega Protein, Inc.*, 2007 WL 203967, *5 (W.D.La. January 23, 2007); *see also Richardson v. Spurlock*, 260 F.3d 495, 498 (5th Cir. 2001). The Court set forth a two-pronged

test for proving such a violation, with the test having both an objective and a subjective element. *Id.* "Objectively, a plaintiff must show that he himself is being exposed to unreasonably high levels of ETS." *Id.* "The objective factor not only embraces the scientific and statistical inquiry into the harm caused by ETS, but also whether society considers the risk to be so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk." *Id.*

"Subjectively, the plaintiff must prove deliberate indifference, considering the officials' current attitudes and conduct and any policies that have been enacted." Id. "Therefore, to obtain relief, a prisoner must prove not only that the level of ETS to which he is exposed is unreasonable, but also that prison officials have shown 'deliberate indifference' to the health risks associated with second hand smoke." *Id.* Moreover, "[t]he adoption of a smoking policy bears heavily on the inquiry into deliberate indifference." *In re Omega Protein* at *5 (citations omitted).

"[D]eliberate indifference requires a finding of 'obduracy and wantonness, not inadvertence or error in good faith.'" *Callicutt v. Anderson*, 48 Fed.Appx. 916, *2 (5th Cir. September 11, 2002) (quoting *Whitley v. Albers*, 475 U.S. 312, 319 (1986)). With regard to the deliberate indifference requirement, the Fifth Circuit has noted as follows:

> [A] prison official cannot be found liable under the Eighth Amendment ... unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). In determining whether prison officials have exhibited deliberate indifference to second-hand smoke, the following factors are relevant: the adoption of a smoking policy; the administration of that policy; and "the *realities* of prison administration". *Id.* (quoting *Helling*, 509 U.S. at 36-37) (emphasis added).

7

*A. Is There a Genuine Issue of Material Fact as to Whether Ware Was Exposed to Unreasonable Levels of Environmental Tobacco Smoke?*

Defendants contend that Ware has failed to demonstrate that he was exposed to unreasonable levels of environmental tobacco smoke for the following reasons: (1) he was housed in a dorm with identified non-smoking areas and prison officials instructed inmates not to smoke in the bed and television areas; (2) he was incarcerated at MPDC for a little over a year in multiple dormitories, all with adequate operating ventilation systems; (3) Ware cannot prove an injury resulting from exposure to ETS because he has no pre-existing condition that would make him more susceptible to harm caused by ETS; (4) although he claims to have developed red eyes, a cough, and headaches, he did not submit a grievance to prison authorities until October 2006, over one year after he was first incarcerated at MPDC; (5) he did not submit any medical requests or complain of any health problems prior to October 2006; (6) he has not shown an injury resulting from the alleged exposure to ETS because he has not produced any medical records or witnesses supporting his claim or relating any of his alleged injuries to smoke; and (7) he purchased tobacco products from the prison commissary and gave them to other inmates, thereby contributing to his exposure to ETS.

The undersigned finds Defendants' argument in this regard to be unpersuasive for two reasons. First, although Defendants argue that Ware has not demonstrated that the level of ETS in his dormitory was unreasonably high, "[t]he Fifth Circuit has recognized potential environmental tobacco smoke claims where exposure to tobacco smoke has been severe and sustained, such as when a plaintiff inmate shares close living quarters with smokers or is required to work in a smoke-filled environment." *Robinson v. Louisiana*, 2008 WL 4693248, *5 (M.D.La. September 23, 2008); *see also Rochon v. City of Angola*, 122 F.3d 319, 320 (5th Cir.1997) (inmate forced to live and work in "environments filled with tobacco smoke"). For

example, in *Murrell v. Chandler*, 277 Fed.Appx. 341, *2 (5th Cir. April 30, 2008), the Fifth Circuit indicated that a prisoner's sworn declaration stating that (1) he was housed in a non-smoking unit where smokers were also housed; (2) he was exposed to excessive levels of ETS 12 to 24 hours a day in his housing unit and where he worked; and (3) the smoke was so thick he had to hold a wet towel over his face in order to breathe[4] was sufficient to create a genuine issue of material fact regarding whether the prisoner was exposed to unreasonably high levels of ETS.

In this case at bar, Ware has produced competent summary judgment evidence that (1) approximately 30 of the 52 inmates that he was housed with smoked seven days a week; (2) the level of second-hand smoke in his dormitory was so high that "it looked like a fog" and the white laundry baskets and the ceiling were dingy yellow; (3) although the inmates were not supposed to smoke in the bed area, they did so; (4) the inmates "smoked everywhere"; (5) the ventilation system did not work properly in the dorms; and (6) his exposure to second hand smoke caused him to experience a cough, headaches, and red eyes.[5] The undersigned finds such evidence, if believed, to be sufficient to create a genuine issue of material fact regarding whether Ware was exposed to unreasonably high levels of ETS.

Second, courts in the Western District of Louisiana have taken judicial notice of the United States Surgeon General's June 2006 report, which concluded that there is <u>no safe level of</u>

---

[4] The prisoner in *Murrell* also stated that he "advised the defendants that the no-smoking policy was not being enforced and that he was having serious health problems that included migraine headaches and respiratory problems. *Id.*

[5] This evidence is in the form of Ware's verified complaint and his deposition testimony. Ware also states in his verified complaint that he does not know how much damage has been done to his body. [Doc. #1, p. 4].

exposure to second hand smoke,[6] in finding that prisoners met the objective component of the *Helling* test.[7] *See Murrell v. Casterline*, 2008 WL 822237, *1 (5th Cir. March 25, 2008) (noting that the magistrate judge in the lower court took judicial notice of such report in concluding that plaintiff had met first prong of *Helling* on summary judgment); *In re Omega Protein*, 2007 WL 203967 at *5-6. The Surgeon General's Report leads to the inescapable conclusion that housing inmates in a smoke-free facility where a non-smoking policy is consistently and strictly enforced would be the sole efficacious means to prevent a further serious risk of harm to non-smoking prisoners such as the plaintiff.[8] Therefore, in accordance with Federal Rule of Evidence 201, the

---

[6] See The Health Consequences of Involuntary Exposure to Tobacco Smoke: A Report of the Surgeon General-Executive Summary, available at http://www.surgeongeneral.gov/library/secondhandsmoke/report/executivesummary.pdf.

[7] Pursuant to Rule 201, a court may take judicial notice of an adjudicative fact that is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources who accuracy cannot reasonably be questioned. Fed. R. Evid. 201(b). Moreover, judicial notice may be taken at any stage of the proceeding. Fed. R. Evid. 201(f).

[8] The Surgeon General summarized his July 2006 report as follows: "The Surgeon General's Report that we are releasing today, The Health Consequences of Involuntary Exposure to Tobacco Smoke, documents beyond any doubt that secondhand smoke harms people's health. In the course of the past 20 years, the scientific community has reached consensus on this point."I would like to draw your attention to several new conclusions that I have reached due to overwhelming scientific evidence. Secondhand smoke exposure causes heart disease and lung cancer in adults and sudden infant death syndrome and respiratory problems in children. There is NO risk-free level of secondhand smoke exposure, with even brief exposure adversely affecting the cardiovascular and respiratory system. Only smoke-free environments effectively protect nonsmokers from secondhand smoke exposure in indoor spaces. Finally, the Report concludes that, while great strides have been made in recent years in reducing nonsmoking Americans' secondhand smoke exposure, millions of Americans continue to be exposed to secondhand smoke in their homes and workplaces. We know that secondhand smoke harms people's health, but many people assume that exposure to secondhand smoke in small doses does not do any significant damage to one's health. However, science has proven that there is NO risk-free level of exposure to secondhand smoke. Let me say that again: there is no safe level of exposure to secondhand smoke. Breathing secondhand smoke for even a short time can damage cells and set the cancer process in motion. Brief exposure can have immediate harmful effects on blood and

undersigned takes judicial notice of such report.

Defendants argue that Ware was incarcerated for a little over a year in multiple dormitories, all with adequate operating ventilation systems. However, Ware stated in his deposition that the level of ETS was approximately the same in each dormitory in which he lived, and Defendants have offered no evidence supporting their assertion that the ventilation systems in the dorms were adequate. They cite to Ware's deposition testimony as support for the assertion that the ventilation systems blew fresh air in to the dormitories, but Ware stated in his deposition that the vents in his dormitory were not adequate in that there was no proper circulation of air going *out* of the dormitory. [Def. Ex. B, p. 11] Therefore, Defendants' argument in this regard does not support their position.

Defendants also argue that Ware did not submit any medical requests regarding his health problems prior to October 2006 and has not produced any medical records substantiating his health problems and their connection to ETS. However, the undersigned finds that Ware's sworn statements that his exposure to ETS has caused him to suffer a cough, headaches, and red eyes to be sufficient to survive summary judgment, especially given Ware's deposition testimony that he had not been given a chance to see a doctor. Whether Ware's failure to submit medical requests or records corroborating his testimony precludes him from recovering is an issue for trial, not summary judgment. Moreover, the Fifth Circuit has recognized that "a prisoner states an Eighth Amendment claim if he alleges that he was exposed to ETS for a sustained time, even if the ETS had not already harmed his health." *Murrell*, 109 Fed.Appx. at *1 (citing *Rochon v. City of*

---

blood vessels, potentially increasing the risk of a heart attack. Secondhand smoke exposure can quickly irritate the lungs, or trigger an asthma attack. For some people, these rapid effects can be life-threatening. People who already have heart disease or respiratory conditions are at especially high risk."

11

*Angola*, 122 F.3d 319, 320 (5th Cir. 1997) (finding that plaintiff stated a claim to the extent he alleged his future health was harmed by exposure to ETS)).[9] Therefore, even though the undersigned finds that Ware has sufficiently demonstrated a present injury for summary judgment purposes, the lack of a present injury would not be fatal to an ETS claim.

Finally, with regard to the cigarettes Ware purchased from the prison commissary, Ware stated in his deposition that he did not smoke them; rather, he used them to barter with other inmates. Although such a practice may have contributed to the level of ETS to which Ware was exposed, it does not follow that there is no genuine issue of material fact as to whether Ware was exposed to unreasonably high levels of ETS. *See Wansley v. King*, 2008 WL 4066711, *8 n.6 (S.D.Miss. August 27, 2008) (finding genuine issues of material fact regarding Plaintiff's ETS claim despite Defendant's contention that Plaintiff purchased tobacco products from prison commissary and Plaintiff's contention that he purchased such products for his friends and not himself).

Based on the foregoing discussion, there is a genuine issue of material fact regarding the objective component of the *Helling* test, i.e. whether Plaintiff was exposed to unreasonably high levels of ETS. This finding, however, does not end the inquiry in this case. Ware still must demonstrate that there is a genuine issue of material fact regarding whether Defendants acted with deliberate indifference.

### B. Is There a Genuine Issue of Material Fact as to Whether Defendants Exhibited Deliberate Indifference to Ware's plight?

In arguing that Ware has not demonstrated deliberate indifference, Defendants rely on the

---

[9] In *Rochon*, the plaintiff argued that if the ETS had not already harmed his health, it posed a threat to his future health. 122 F.3d at 320.

fact that the day after Ware filed his grievance, Warden Brown offered to transfer Ware to a lock-down cell in order to avoid further exposure to ETS, but Ware refused and instead requested a transfer to another facility.[10] Defendants also rely on Ware's concession in his deposition that the lock-down cells were under a no-smoking policy and that even though some inmates smoked in the lock-down cells, any contraband was confiscated during periodic searches of the cells. Defendants argue that Ware did not complain about the ETS for over a year, and he was transferred from MPDC six weeks after he filed his grievance.

After considering the evidence in the record, the undersigned finds that Defendants are entitled to summary judgment as to Ware's claim against Warden Brown; however, they have failed to meet their summary judgment burden regarding the remaining Defendants.

With regard to Warden Brown,[11] Defendants refer to the fact that Ware stated in his original complaint, which is verified, that the day after Ware filed his grievance in October 2006, Warden Brown told him that inmates who had a problem with second-hand smoke could be transferred to a no-smoking lock-down cell. He further states that Warden Brown offered him a transfer, but he refused because he did not want to be punished by being put in a lock-down cell.

---

[10] The undersigned notes that Defendants cite to Ware's deposition testimony in support of this fact, but nowhere in such testimony is this fact discussed. However, Ware stated the fact in his verified complaint, which is competent summary judgment evidence. *Hart v. Hairston*, 343 F.3d 762, 765 (5th Cir. 2003) ("On summary judgment, factual allegations set forth in a verified complaint may be treated the same as when they are contained in an affidavit.").

[11] The Fifth Circuit has held that "[a] supervisory official is not liable for the actions of subordinates on a theory of vicarious liability or respondeat superior, but he will have personal liability if he is personally involved in a constitutional deprivation or if there is a sufficient causal connection between the supervisor's conduct and the violation." *Murrell*, 277 Fed.Appx. at *2. A prison warden is a supervisory official. *See Anderson v. Wilkinson*, 2007 WL 2903057, *2 (W.D.La. September 12, 2007).

The fact that Warden Brown offered Ware a transfer to a non-smoking environment is certainly not indicative of deliberate indifference. *See Brown v. Bowles*, 2000 U.S.Dist.LEXIS, *9-10 (N.D.Tex. July 17, 2000) (rejecting plaintiff's deliberate indifference claim on the ground that he was offered housing in a single cell to avoid second hand smoke).

Moreover, although Ware stated in his deposition that inmates smoked in the lock-down cells despite the no-smoking policy, he also acknowledged that prison officers periodically searched the cells for contraband and confiscated any tobacco products that they found. Numerous courts have found that even if a prison's no-smoking policy is being violated, the fact that prison officials are actively attempting to enforce such policy belies the existence of deliberate indifference. *See Anderson*, 2007 WL 2903057 at *2 (finding that prisoner had failed to state a claim upon which relief could be granted based in large part on the fact that although the no-smoking policy in the prisoner's unit was violated, the defendant had confiscated sixty packs of tobacco products and therefore was enforcing the policy to the best of his ability); *Folse v. Jones*, 2008 WL 4909543, *10 (W.D.La. September 11, 2008) (dismissing prisoner's ETS claim as frivolous in part because defendants disciplined inmates caught violating no-smoking policy). Therefore, the undersigned finds that the Warden Brown has met his initial burden of demonstrating that there is no genuine issue of material fact as to whether he acted with deliberate indifference. The burden the shifts to Ware to point to specific evidence in the record indicating that there are issues remaining for trial.

Ware has failed to meet his burden in this regard. He has not produced any evidence indicating that he made Warden Brown subjectively aware of the level of ETS in his dormitory, that the no-smoking policy in the bed and television areas was not being enforced prior to

14

October 2006, or that the no-smoking policy in the lock-down cells was not being enforced. Ware points to the fact that when questioned regarding whether he filed any grievances prior to the one he filed October 2006, he stated that he filed a couple of grievances with Warden Brown but some of them were thrown away. He stated that a sergeant and another guard at MPDC threw away all of his legal work, including "everything he had on them," when he was transferred out of the facility.[12] However, when questioned again specifically regarding whether he filled out a grievance before October 2006, Ware stated that he did not remember.

Given the inconsistent and equivocal nature of Ware's testimony in this regard and the fact there is not even an approximation as to when these alleged other grievances were filed, this testimony is insufficient to create a genuine issue of material fact. A genuine issue of fact sufficient to defeat summary judgment must be shown by more than speculation or "a mere scintilla of evidence," *Little*, 37 F.3d at 1075, and the evidence must be such that "a reasonable jury drawing all inferences in favor of the nonmoving party could arrive at a verdict in that party's favor." *International Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263 (5th Cir. 1991). Ware also argues that he should not be required to go to an area reserved for disciplinary problems just to breathe fresh air; however, confinement with fewer privileges does not constitute a constitutional deprivation. *See Brown* at *9 ("[C]onfinement by choice in a single cell to avoid second-hand smoke does not implicate the constitution."). Accordingly, the undersigned finds that Ware has failed to produce sufficient evidence indicating deliberate indifference on the part of Warden Brown; therefore, it is recommended that Defendants' motion

---

[12] As noted previously, Ware states in his amended complaint that Sergeant Klax and Deputy John Harris threw away every A.R.P. that he written on them when he was transferred from MPDC. Therefore, presumably these are the individuals to whom he is referring.

for summary judgment be GRANTED as it pertains to Warden Brown.

With regard to the remaining defendants, however, Defendants have failed to meet their burden of demonstrating that they are entitled to summary judgment. Ware alleges in his unverified amended complaint that all of the Defendants had knowledge of the fact that inmates were smoking in both the dormitories and the lock-down cells at MPDC. Although the allegations in an unverified complaint are not sufficient to defeat summary judgment when the defendant has met its summary judgment burden, whether the defendant has met its initial burden must determined with reference to such allegations. Moreover, in his deposition, Ware stated that although inmates were not permitted to smoke in the bed and television areas of the dormitories, they did so anyway, and it depended on who the inmate was as to whether the prison officers would stop them.

In arguing that they are entitled to summary judgment, Defendants focus almost entirely on events which occurred after October 2006 when Ware filed his grievance, i.e. that Warden Brown offered Ware a transfer to a lock-down cell; the lock-down cells were no-smoking and, even though Ware alleges that inmates smoked in lock-down, he admitted that guards confiscated contraband when they found it; and Ware was transferred from MPDC six weeks after he filed his grievance. However, although the actions of Warden Brown are certainly relevant to any liability on his part, he is not the only Defendant in this case and his actions do not automatically absolve the remaining defendants of liability, each of whom may have played a separate and distinct role in the events giving rise to the Ware's claim.[13] Moreover, although Defendants[14]

---

[13] Other than alleging that all of the defendants were aware that inmates were smoking tobacco in the dormitories and lock-down cells, Ware does not delineate any specific conduct on the part of most of the individual Defendants in his amended complaint. Defendants, however,

may have been attempting to enforce the no-smoking policy in the lock-down cells, Ware's claim is not based solely on the level of ETS in the lock-down cells; rather, it is based primarily on the level of ETS in the dormitories.

Defendants make no attempt to distinguish between the bases of liability for each of them individually, but instead argue that they, as a group, are entitled to summary judgment based on the above facts. However, as Ware alleges that all of the defendants were aware of the smoking going on the dormitories and stated in his deposition that the no-smoking policy in the bed and television areas was not being enforced, Defendants have failed to carry their summary judgment burden . *See Murrell*, 2008 WL 822237 at *2 (noting prisoner's evidence indicating that although there was a no-smoking policy, prison officials "looked the other way" when prisoners smoked in their cells or other no-smoking areas in denying summary judgment). Defendants have not contradicted these allegations with any evidence such as their own affidavits or deposition testimony. Moreover, although the undersigned acknowledges that Rule 56 permits Defendants to meet their summary judgment burden by merely demonstrating that Ware lacks

---

have moved for summary judgment; therefore, it is their responsibility to demonstrate to this Court why they are entitled to a dismissal of this case, and they were afforded the opportunity for discovery in order to fully develop the bases of Ware's claims.

In his objections to an earlier Report & Recommendation issued by the undersigned regarding whether Ware had stated a claim for relief for exposure to ETS, Ware stated that in May 2006 Sergeant Jackie Robinson came into Delta Dorm where he was living and laughed at the amount of smoke that was in the dormitory. He further states that in August 2006 he had statements with Sergeant Smith, Sergeant Klax, and Lieutenant Brown about second-hand smoke in the dorms and lock-down cells. As these statements are unsworn, they are not competent summary judgment evidence, but they are illustrative of the fact that the actions of Warden Brown are not dispositive as to all of the defendants.

[14] It is not entirely clear whether any of the defendants were the individuals responsible for enforcing the no-smoking policy in the lock-down cell.

evidence on an essential element of his claim, as opposed to contradicting Ware's claims with evidence of their own, Defendants have not done so. They have not demonstrated to this Court how each of them individually, based on their specific relationship to the facts giving rise to Ware's allegations regarding ETS in the MPDC dormitories, is entitled to summary judgment based on a lack of deliberate indifference.

Defendants ask this Court to take judicial notice of the fact that MPDC and similar institutions in Louisiana are not non-smoking facilities and have no non-smoking alternatives for inmates other than lock-down cells or transfer to another facility. Defendants also argue that the Louisiana Smoke Free Air Act (2007), which prohibited smoking in all public places, does not take effect for jails and prisons until August 15, 2009. However, not only was the this act not passed until after the events giving rise to Ware's claim took place, but the fact that MPDC is a not a non-smoking facility, and is not required by law to be one, does not mean that a prisoner is precluded from maintaining a claim that being housed in an environment in which he exposed to unreasonably high levels of ETS constitutes cruel and unusual punishment. This is evidenced by the *Helling* Court's instruction that the adoption of a no-smoking policy and the administration of that policy are central considerations in the evaluation of ETS claims. In addition, Defendants have not provided any substantiation for their assertion that MPDC has *no* non-smoking alternatives other than lock-down cells or transfer to another facility. The undersigned can not take judicial notice of such "facts" merely because Defendants say they are so in their memorandum.

Accordingly, the undersigned finds that the remaining defendants – Sheriff Danny McGrew, Warden Robert Tappin, Sergeant Jackie Robinson, Sergeant Klax, Deputy John Harris,

Sergeant Smith, and Correctional Officer Morrison – have failed to meet their summary judgment burden. These defendants have not demonstrated that there are no genuine issues of material fact regarding Ware's Eighth Amendment ETS claim as it pertains to them; therefore, it is recommended that their motion for summary judgment be DENIED.

## CONCLUSION

For these reasons, it is recommended that Defendants' motion for summary judgment [Doc. #105] be **GRANTED** as it pertains to Defendant Warden I. Brown and that Ware's claim against Brown be dismissed with prejudice. It is further recommended that Defendants' motion for summary judgment be **DENIED** as it pertains to Defendants Sheriff Danny McGrew, Warden Robert Tappin, Sergeant Jackie Robinson, Sergeant Klax, Deputy John Harris, Sergeant Smith, and Correctional Officer Morrison.

Under the provisions of 28 U.S.C. §636(b)(1)(c) and FRCP Rule 72(b), the parties have **ten (10) business days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within **ten (10) business days** after being served with a copy thereof. A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing. Timely objections will be considered by the District Judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN TEN (10) BUSINESS DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL**

**FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

**THUS DONE AND SIGNED** this 25th day of November, 2008, in Monroe, Louisiana.

*[signature]*
KAREN L. HAYES
U. S. MAGISTRATE JUDGE